770 F.2d 288
 In re G. & A. BOOKS, INC., 250 Book Center, Inc., Courageous
Books, Inc., and M.J.M. Exhibitors, Inc., Plaintiffs,
M.J.M. EXHIBITORS, INC., Plaintiff-Appellant,
v.
William J. STERN, individually and as Chairman of the New
York State Urban Development Corporation, William H. Daly,
individually and as Director of the Office of Midtown
Enforcement of the City of New York, Steven Spinola,
individually and as President of the Public Development
Corporation of the City of New York, Herbert J. Sturz,
individually and as Chairman of the City Planning Commission
of the City of New York, Edward I. Koch, individually and as
Mayor of the City of New York, the City of New York, Park
Tower Realty Corp., Planning Innovations, Inc., Tishman
Speyer Properties and Equitable Life Assurance Society of
the United States, Defendants-Appellees.
 No. 1287, Docket 85-7190.
 United States Court of Appeals,
Second Circuit.
 Argued May 22, 1985.
Decided Aug. 8, 1985.
 
 Ralph J. Schwarz, Jr., New York City (Keith N. Costa, New York City, on brief), for plaintiff-appellant.
 Martin Flumenbaum, New York City (Jay Cohen, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for defendants-appellees Tishman Speyer Properties and Equitable Life Assur. Society of U.S.
 June A. Witterschein, New York City (Frederick A.O. Schwarz, Jr., Corp. Counsel of City of New York, Jeffrey E. Glen, Leonard Koerner, Robert J. Pfeffer, Gary Schuller, New York City, of counsel), for Municipal defendants-appellees.
 Shea & Gould, New York City (Bernard D. Fischman, Dean G. Yuzek, Judith L. Spanier, New York City, of counsel), for defendant-appellee Park Tower Realty Corp.
 Leahey & Johnson, P.C., New York City (Peter James Johnson, Asher Marcus, Kevin B. Lynch, Michael Conforti, New York City, of counsel), for defendant-appellee William J. Stern.
 Devov Morris & Hammerling, New York City (Robert C. Hammerling, Marshall H. Fishman, New York City, of counsel), for defendant-appellee Planning Innovations, Inc.
 Before MANSFIELD, VAN GRAAFEILAND and PIERCE, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 M.J.M. Exhibitors, Inc. ("MJM"), which operates an adult retail store on 42nd Street, using peep machines for the exhibition of sexually-oriented films, selling tapes, and furnishing live performances, appeals from an order and judgment of the Southern District of New York, Constance Baker Motley, Chief Judge. The order denied appellant's motion for a preliminary injunction against various municipal, state, and corporate defendants' proceeding with the New York State Urban Development Corporation's ("UDC") Times Square Rehabilitation Project (the "Project") and granted summary judgment dismissing the action. The complaint, filed by MJM and three other plaintiffs operating adult retail stores on 42nd Street, alleges that defendants' actions in furtherance of the Project, including destruction of buildings in which plaintiffs currently operate their businesses, would violate plaintiffs' rights under the First and Fourteenth Amendments. Finding that the proposed condemnation of plaintiffs' property did not constitute an illegal prior restraint and that the Project plan did not classify speech on the basis of content, or burden it with overly restrictive regulations, the district court granted summary judgment to defendants. We affirm.
 
 
 2
 This case arises from the efforts of the City of New York (the "City") and the UDC to implement a comprehensive plan for the elimination of blight and the rehabilitation of the 42nd Street/Times Square area of Manhattan, New York City. Under the New York State Urban Development Corporation Act, New York Unconsolidated Laws, Secs. 6251, et seq. (McKinney 1979), the Legislature vested the UDC with broad powers to enter into contracts and acquire property for the reconstruction, improvement and rehabilitation, in cooperation with private enterprise, of slum or blighted areas for the purpose of eliminating crime and delinquency, improving the physical, educational and economic development of such areas, and increasing employment and business opportunities therein.
 
 
 3
 In June 1980 the City and the UDC entered into a formal "Memorandum of Understanding," in which they agreed to cooperate to improve and redevelop the 42nd Street area, in order to ameliorate the "street crime, substandard and [unsanitary] conditions, undesirable uses and physical and social blight which have impaired the sound growth and development of the Project Area and of the City as a whole." By June 1981 these two parties had issued the "42nd Street Development Project: A Discussion Document" and design guidelines for the Project, and had made a formal request for proposals from private developers for the construction of new buildings to be used as retail stores, theatres, and for other purposes. The "Project Area" consists of a 3-block section between 40th and 42nd Streets, bounded by Broadway and Eighth Avenue. The UDC Board of Directors also issued two documents, "Basis for Blight Finding" and "Statutory Findings of Substandard Area," setting forth the factual findings required by the UDC Act. Having in September 1981 received and reviewed the proposals made by private developers, conditional designations of developers to construct and maintain the proposed office buildings, merchandise mart, hotel and theatres for the project were made. An environmental impact statement was submitted pursuant to the New York State Environmental Quality Review Act ("SEQRA"), New York Environmental Conservation Law, Secs. 8-0101, et seq. (McKinney 1984), and public hearings were held by the UDC pursuant to the UDC Act, SEQRA, New York's Eminent Domain Procedure Law and the New York Historic Preservation Act. In November 1982 the UDC formed the Times Square Redevelopment Corporation ("TSRC") and entrusted it with primary responsibility for the development of the Times Square area.
 
 
 4
 The primary document setting forth the factual basis for the Project is the Final Environment Impact Statement ("FEIS"), issued in August 1984 after several public meetings responding to an earlier Draft Environmental Impact Statement. The FEIS graphically depicts the social blight in the Project Area:
 
 
 5
 "In addition to the uses on the blocks that are distasteful to many [including eight theatres showing action, horror, and brutality films and four showing pornographic films, 15 sex businesses (all prominently displaying sexually explicit material), bar outlets, window displays of knives and blackjacks, bars, fast food restaurants, and arcades], visitors often find the collection of hustlers and loiterers threatening. At virtually any hour, at least a few people will be found 'hanging out' along the sidewalks; and in the afternoons and evenings, the ranks can swell dramatically and number in the hundreds. The drug dealers and their customers, public drinkers, homeless persons, young people simply standing around, gathered as they often are in groups blocking the sidewalks and aggressively soliciting business, have an impact far beyond their absolute numbers. Forty-second Street is their territory, and those passing through it often perceive that they do so at their own risk.
 
 
 6
 "The reality of the risk is borne out by crime statistics for the area. Forty-second Street between Seventh and Eighth Avenues has consistently been among the most crime ridden in the City. Despite increased police deployment, reported crime in the area increased by 53 percent from 1978 to 1980 and since that time has remained consistently high. Below ground, the Times Square and Eighth Avenue subway stations serving the project area have regularly ranked number one and two in reported felony and misdemeanor complaints. It is hardly surprising that the police regard 42nd Street as a 'breeding ground' for crime, especially among the young."
 
 
 7
 The FEIS treats the severe underuse of the land in the Project Area's 13 acres as further evidence of blight. Only 4,000 people, an extraordinarily low figure for a five-block area located adjacent to one of the world's most densely developed business districts, work in the area. As a result of an absence of development for more than half a century, the existing buildings are old and run down; most are substandard for their intended commercial uses and many are vacant above the first floor. While the area is zoned for the highest density allowed in the City, 16% of the land area is used only for parking, 72% of the development rights have not been used, and 18% of the developed parts is vacant. The tax yield from the Project area is commensurately low: the FEIS estimated that while the existing properties in the Project area were expected to pay approximately $5.4 million in taxes in 1984-85, a single building a block away was expected to pay $6.2 million in taxes.
 
 
 8
 To overcome these conditions, the FEIS defined the following project goals:
 
 
 9
 "First, to eliminate the blight and physical decay, as well as the crime and frightening street life, that now characterizes the West 42nd Street area;
 
 
 10
 Second, to preserve and restore the area's extraordinary older theaters for theatrical and upgraded movie use, and, by so doing, to revitalize the project area as a theater and entertainment center serving tourists and all New Yorkers;
 
 
 11
 Third, to develop the project area's commercial and retail potential to produce a lively, healthy street ambience and to support the City's policy (as expressed in the new Midtown Zoning) that encourages the movement of Midtown office construction westward;
 
 
 12
 Fourth, to held upgrade public facilities in the project area, particularly the Times Square subway station;
 
 
 13
 Fifth, to increase the project area's economic contribution to the City as a whole, both through increased revenues to the City and expanded private investment and employment opportunities; and
 
 
 14
 Sixth, to restore the project area's role as a positive influence on the adjacent communities, notably the theater district, the garment center, and the Clinton residential neighborhood, and as a productive link among these communities and the expanding midtown office district."
 
 
 15
 The FEIS describes the substantial new construction intended to achieve these Project goals. Four office towers, ranging in height from 29 to 56 stories, will be built at the east end of the Project area, while the west end will be anchored by a 20-story wholesale mart and a hotel. Nine historic theatres will be restored for the live stage, and the Carter Hotel and historic Candler Building will be retained. The remaining mid-block sites will be reconstructed for retail use, with the FEIS indicating that the character of the retail uses will differ substantially from the current uses:
 
 
 16
 "When completed the project will eliminate or alter nearly all of the special uses in the project area. Specifically, there will be no action or pornographic movies, sex-related establishments, or pinball arcades. Subway entrances and mezzanine will be redesigned to bring clarity and light to underground spaces. The new development will contain some fast food places and certainly, restaurants selling beer or liquor, but these establishments will play an important role in supporting a new mix of uses: theaters, first-class offices, a hotel, and wholesale mart."[1]
 
 
 17
 An integral part of the Project is the reconstruction and improvement of the Times Square subway station, currently one of the busiest but also one of the most poorly-organized and crime-ridden in the transit system. The FEIS estimated that the Project would generate more than $650 million in additional real estate taxes to the City by the year 2005 and would add 21,000 net jobs to the Project area.
 
 
 18
 The UDC's Board of Directors approved the FEIS on October 4, 1984. After holding public hearings on the plan, the City's Board of Estimate approved it on November 8, 1984. The UDC published the findings required by the Eminent Domain Procedure Law on November 15 and 16. After all necessary requirements have been completed, the UDC intends to acquire the property needed to effectuate the Project.
 
 
 19
 In the meantime, on October 19, 1984, the four plaintiffs in this action, all of whom sell sexually-oriented books and magazines, films and video tapes, or exhibit and present sexually-oriented films, tapes, dances, or performances, filed their complaint. Count I concedes that "all [businesses] located in the Project area will be removed by the condemnation," (paragraphs 8, 27) but asserts that the various Project documents indicate that only businesses of the sort plaintiffs operate will not be permitted to relocate in the Project's retail locations (paragraphs 8, 27, 95).
 
 
 20
 The complaint alleges that the governmental actions destroying plaintiffs' property but denying them the right to relocate, which plaintiffs contend are merely a continuation of selective enforcement of various laws against them in recent years, constitute an unconstitutional prior restraint, a classification of speech on the basis of content in violation of the First and Fourteenth Amendments, and an impermissible retroactive destruction of First Amendment rights.
 
 
 21
 Count II of the complaint alleges that since the Project documents fail adequately to establish that plaintiffs' businesses contribute to dangerous conditions in the area no justification exists for the UDC's use of its eminent domain power against them, and that condemnation is improper because the "less drastic means" of "police sweeps" could be used to reduce crime in the Project area. The complaint seeks $12 million in damages, a declaration that the Project violates plaintiffs' constitutional rights, a preliminary and permanent injunction, and reasonable attorney's fees.
 
 
 22
 Appellees moved to dismiss the complaint pursuant to Rule 12(b)(1) & (6), Fed.R.Civ.P., on ripeness and abstention grounds; the private developers urged that they were not properly joined as defendants in the action. In affidavits accompanying the motions to dismiss, defendants Sturz (Director, New York City Department of City Planning, and Chairman, City Planning Commission) and Stern (Chairman, UDC) denied that any arbitrary use restrictions would be imposed to prevent plaintiffs from relocating in the retail establishments in the Project area after the condemnation and redevelopment process is completed.
 
 
 23
 Chief Judge Motley heard oral argument on the motions on December 12, 1984. Although the motions had been fully briefed and submitted by the date of the hearing, appellant was given an opportunity to submit additional sur-reply papers. By decision and order dated February 5, 1985, the district court converted defendants' Rule 12(b)(6) motion to one for summary judgment, granted judgment in favor of defendants and denied plaintiffs' motion for preliminary injunctive relief. The district court noted that "by and large, plaintiffs do not challenge the essential factual content of the FEIS, but merely seek to interpret it differently than do defendants." The court reviewed the FEIS' findings regarding the physical and social blight in the Project area, its stated goals for the Project, and the means for accomplishing these goals. It concluded:
 
 
 24
 "The Project serves substantial state interests in eliminating physical and social blight in the form of underutilized and decaying buildings, violent crime, prostitution, and drug dealing. It seeks to preserve the area's historic theaters, overhaul the subway stations, provide a wholesale merchandise mart for local industry, and build four major office towers which will bring thousands of new people into the neighborhood while significantly increasing the area's tax base.
 
 
 25
 "These goals, in and of themselves, are substantial, important, and unrelated to the suppression of free speech...."
 
 
 26
 Although the district court found a substantial basis for the Project independent of any desire to suppress speech, it also concluded that "the government defendants have an official policy of hostility towards adult uses," and that the Project would have some impact on the dissemination of sexually explicit materials, if only from the fact that many businesses selling such matter would at least temporarily be displaced.
 
 
 27
 Judge Motley rejected defendants' arguments that the court should abstain, that none of plaintiffs' claims were ripe for determination, and that the private developers had not been properly named as parties to the action. The claim that the Project constituted a prior restraint was rejected "for one simple reason: Whatever the varied motivations behind the Project, in actual application the plan does not single out plaintiffs' speech for special treatment." She rejected plaintiffs' argument that the Project is unnecessarily suppressive of speech, concluding that it satisfied the test enunciated in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), as synthesized in Young v. American Mini Theatres, 427 U.S. 50, 79-81, 96 S.Ct. 2440, 2456-58, 49 L.Ed.2d 310 (1976) (Powell, J., concurring). (See p. 296, infra). In concluding that the Project did not unnecessarily restrict plaintiffs' speech the district court was especially influenced by the fact that a substantially less restrictive plan could not be expected to fulfill the goals of the Project and that the general availability of sexually explicit material would not be severely curtailed by closing plaintiffs' businesses, since several dozen adult uses would remain within a few blocks of the Project area.
 
 
 28
 Having found that the Project served legitimate, substantial public purposes and that it satisfied the Young-O'Brien analysis, Judge Motley declined to decide an issue plaintiffs had repeatedly adverted to, the constitutionality of the City's zoning restrictions concerning coin-operated machines, such as those used for peep shows, since that issue had not been raised in the pleadings. Noting that the court had examined matters beyond the pleadings in making its findings of fact, and that all parties had had ample opportunity to present all relevant material to the court, Judge Motley treated defendants' motion as one for summary judgment, pursuant to Fed.R.Civ.P. 12(b)(6) and 56. Deciding that there were no material questions of fact to be determined at trial, the court granted the motion for summary judgment.[2]
 
 DISCUSSION
 
 29
 Before we may consider the merits of the district court's grant of summary judgment dismissing the complaint we must first decide whether, as appellant contends, the district court failed to give it sufficient notice that defendants' motion for dismissal was being converted under Rule 12(b)(6), Fed.R.Civ.P., into a Rule 56 motion for summary judgment. If insufficient notice and an opportunity to respond were afforded, it would be necessary for us to reverse the dismissal and remand the case for further proceedings.
 
 
 30
 Rule 12(b)(6) permits the district court to consider matters outside the pleadings and to treat a motion for dismissal as one for summary judgment provided "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Rule 56(c), in turn, provides that "[t]he motion shall be served at least 10 days before the time fixed for the hearing" and that the adverse party may serve opposing affidavits. Compliance with these requirements, however, is not an end in itself. The district court's conversion of a Rule 12(b)(6) motion into one for summary judgment is governed by principles of substance rather than form. The essential inquiry is whether the appellant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings. Resolution of this issue will necessarily depend largely on the facts and circumstances of each case. See, e.g., Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 393 (6th Cir.1975). A party cannot complain of lack of a reasonable opportunity to present all material relevant to a motion for summary judgment when both parties have filed exhibits, affidavits, counter-affidavits, depositions, etc. in support of and in opposition to a motion to dismiss, see, e.g., National Family Ins. Co. v. Exchange Nat'l Bank of Chicago, 474 F.2d 237 (7th Cir.), cert. denied, 414 U.S. 825, 94 S.Ct. 129, 38 L.Ed.2d 59 (1973). Even where only the party moving to dismiss has submitted extrinsic material such as depositions or affidavits, the opposing party may be deemed to have had adequate notice that the motion to dismiss would be converted, see, e.g., Condon v. Local 2944, United Steelworkers of America, 683 F.2d 590, 593-94 (1st Cir.1982) (no surprise where defendant supported motion with affidavits and plaintiff had time to furnish information raising a genuine factual issue); Cook v. Hirschberg, 258 F.2d 56, 57-58 (2d Cir.1958) (defendants' filing of affidavits with their motion to dismiss both converted it to a motion for summary judgment and put plaintiffs on notice of their obligation to disclose the merits of their case).
 
 
 31
 Applying these principles here, we find that appellant had ample opportunity to present relevant material outside the record in reply to plaintiffs' submissions and did so. Indeed, from the outset appellant itself submitted materials outside the record. Plaintiffs attached 14 exhibits containing factual materials, including the FEIS, to their complaint, and submitted affidavits and other documents relating to the merits both in support of their motion for a preliminary injunction and in opposition to defendants' motion to dismiss, which were simultaneously considered by the court. At a hearing on December 12, 1984, plaintiffs commented on the factual material provided by them and by defendants. After the hearing, on December 17, 1984, plaintiffs requested and received an extension of time, until December 31, 1984, to submit additional materials. Appellant thus cannot claim to have been unaware that the district court was considering material outside the record or that it lacked notice of the possibility that the district court would convert the motion to dismiss into a motion for summary judgment. The cases on which appellant relies are distinguishable. In Dale v. Hahn, 440 F.2d 633 (2d Cir.1971), the court held that it was error for the district court to have converted the 12(b)(6) motion when the district court considered material the defendant had submitted after giving no indication that it would consider anything but the pleadings, while Beacon Enterprises, Inc. v. Menzies, 715 F.2d 757 (2d Cir.1983), involved the special situation of a pro se plaintiff.
 
 
 32
 Turning to the merits, appellant maintains that the condemnation of its property constitutes a prior restraint on activities protected by the First Amendment. We disagree. Governmental action constitutes a prior restraint when it is directed to suppressing speech because of its content before the speech is communicated. This may take the form of orders prohibiting the publication or broadcast of specific information, see, e.g., Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (order restraining media from publishing or broadcasting accounts of confessions, admissions, or other facts implicating accused); New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam) (order enjoining publication of Pentagon Papers), or systems of administrative preclearance that give public authorities the power to bar the publication or presentation of material, see, e.g., Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 553, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448 (1975) (procedures governing rental of theatre "gave public officials the power to deny use of a forum in advance of actual expression"); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 69-72, 83 S.Ct. 631, 638-40, 9 L.Ed.2d 584 (1963) (Rhode Island administrative book review procedure identified "objectionable" books and effectively prevented their continued publication and circulation).
 
 
 33
 In this case plaintiffs' activities have not been singled out for special treatment. The Project is not aimed at suppression of speech but at eliminating community blight, crime and decay and at restoring the area to commercial and cultural vitality. Plaintiffs' businesses constitute only 1% of the total number of businesses to be displaced. Sex-related establishments within the Project area represent only 5% of all businesses displaced and 3.2% of the total gross square footage to be acquired. The Project is content-neutral and comparable to that before the Supreme Court in Young v. American Mini Theatres, supra, 427 U.S. at 62, 96 S.Ct. at 2448, where the Court found no prior restraint in a requirement that adult motion picture theatres be licensed when all motion picture theatres in a city were required to be licensed and were subject to locational and other requirements. Appellant's reliance on NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), is misplaced; in invalidating a Virginia ordinance prohibiting the solicitation of legal business, the Court did not there discuss the doctrine of prior restraint.
 
 
 34
 Assuming that the Project, although content-neutral, nevertheless has an incidental effect on speech, there remains only the question whether it satisfies the fourpart test relied on by Justice Powell in Young v. American Mini Theatres, supra, 427 U.S. at 79-80, 96 S.Ct. at 2456-57, and later applied by the Court in United States v. Albertini, --- U.S. ----, ----, 105 S.Ct. 2897, 2904, 86 L.Ed.2d 536 (1985). Under that test a governmental regulatory action having an incidental impact on speech will be upheld if (1) the action is within the constitutional power of the government; (2) the action furthers important or substantial government interests; (3) the interests furthered are unrelated to the suppression of free speech; and (4) the restriction on First Amendment freedoms is no greater than is essential to the furtherance of the government interests.
 
 
 35
 Each of these criteria has been met in the present case. Appellant does not dispute that the UDC has the constitutional power to take property by eminent domain. See Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954) (upholding constitutionality of use of eminent domain powers for urban renewal purposes); New York Unconsol.Laws Sec. 6263 (McKinney 1979) (conferring eminent domain power on UDC).
 
 
 36
 It is beyond dispute that the Project is designed to serve the substantial governmental interests of improving the buildings in the area and promoting use up to the permitted zoning potential, to increase tax revenue from the area virtually six-fold in the next 20 years, to raise employment in the area, to save architecturally and historically significant theatres, and to reduce crime. In view of the many plans for redeveloping the 42nd Street area that private associations, non-profit organizations, and public agencies have put forth since 1960, the decision of the City and UDC that the Project's goals could best be achieved by use of the eminent domain power is entitled to considerable deference:
 
 
 37
 "It is not our function to appraise the wisdom of [the city's] decision to require adult theaters to be separated rather than concentrated in the same areas [in order to achieve its interest in preserving the character of its neighborhoods].... [T]he city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect. Moreover, the city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." Young v. American Mini Theatres, supra, 427 U.S. at 71, 96 S.Ct. at 2452 (Opinion of Stevens, J.).
 
 
 38
 While conceding that the Project area is blighted and that its business is only one of more than 400 businesses of many different types that are to be condemned, appellant argues that these facts are irrelevant, since the findings made in support of the Project by the City and UDC purportedly do not demonstrate that appellant's business contributes to the blight. This argument must be rejected; once it has been shown that the surrounding area is blighted, the state may condemn unblighted parcels as part of an overall plan to improve a blighted area. Berman v. Parker, supra, 348 U.S. at 34-36, 75 S.Ct. at 103-04 (upholding urban renewal plan in District of Columbia and specifically rejecting claim that only properties that were blighted or that contributed to blight could be taken for such purposes). Cf. Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) (according wide deference to legislature's land use decisions where its purpose is legitimate and its means are not irrational).
 
 
 39
 The substantial governmental interests which the Project is designed to serve are unrelated to suppression of free speech. While appearing to concede this, appellant nevertheless argues that the Project is unconstitutional since some of the Project's documents indicate that the suppression of sex-related businesses may have been at least a motivating factor in designing the Project. A subjective motivation on the part of some proponents of the Project to suppress sex-related businesses does not render it unconstitutional, provided the Project is justified by substantial government interests independent of such motive. In O'Brien, supra, the Court stated: "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." 391 U.S. at 383, 88 S.Ct. at 1682. Cf. Hart Book Stores, Inc. v. Edmisten, 612 F.2d 821, 829 (4th Cir.1979), cert. denied, 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980) ("relevant question under O'Brien is not whether the perceived 'legislative motive' for legislation is unrelated to the suppression of free expression, but whether an identifiable 'governmental interest' is so unrelated"). Here important governmental interests unrelated to suppression of speech exist, independent of any desire to suppress speech.
 
 
 40
 Appellant's reliance on Playtime Theaters, Inc. v. City of Renton, 748 F.2d 527 (9th Cir.1984), jur. noted, --- U.S. ----, 105 S.Ct. 2015, 85 L.Ed.2d 297 (1985), and Tovar v. Billmeyer, 721 F.2d 1260 (9th Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 223, 83 L.Ed.2d 152 (1984), is misplaced. Both cases are distinguishable since, unlike the situation here, the regulations involved in those cases were not content-neutral and the records were inadequate in both cases to determine whether either city had substantial reasons unrelated to the suppression of speech for the zoning regulations that restricted speech.
 
 
 41
 In interpreting the fourth O'Brien factor, i.e., that the restriction on First Amendment freedoms must be no greater than is essential to the furtherance of the governmental interests, the Supreme Court has recently stated that "an incidental burden on speech is no greater than is essential, ... so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." United States v. Albertini, supra, --- U.S. at ----, 105 S.Ct. at 2907. In making this determination courts will not second-guess the decisions of responsible government officials acting within constitutional constraints. See Clark v. Community for Creative Non-Violence, --- U.S. ----, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (O'Brien does not "assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained."); see also United States v. Albertini, supra, --- U.S. at ----, 105 S.Ct. at 2907 (O'Brien does not assign to the judiciary the authority to manage military facilities throughout the Nation.
 
 
 42
 Applying these principles, we find that the City and UDC acted within the bounds of the Constitution in concluding that use of the eminent domain power would be a more effective means of achieving the Project's goals than would other means. Appellant maintains that the City and State could have used the less drastic means of "police sweeps," which it claims have been successful outside of the Project area. We agree with the district court's reasonably-based and fairly evident conclusion that "a substantially less restrictive plan [than that of the Project] could not be expected to fulfill the goals of the Project." With reference to police sweeps, the court concluded that they might only serve to move crime to another area or temporarily mitigate the overall climate of criminal activity in the area, while doing nothing to remedy the physical blight resulting from decaying buildings and underused property. Absent evidence (and none was proffered) that police sweeps would be a less restrictive and equally effective means of accomplishing the Project's goals, we will not substitute our judgment for that of the responsible officials of the City and UDC who, after long study of the problem, concluded that use of the eminent domain power will more effectively achieve the substantial governmental interests involved.
 
 
 43
 In concluding that the final O'Brien criterion has been satisfied we agree with the district court that "the general availability of sexually explicit material in the midtown area will not be severely curtailed by the closing of plaintiffs' businesses, because several dozen adult uses will remain within a few blocks of the Project area." This conclusion is supported by FEIS Figure 2-15, attached as Exhibit A to UDC Chairman Stern's affidavit and not refuted. The exhibit reveals that in June 1983 there were 72 sex-related uses in the area between 33rd and 59th Streets, from 6th to 8th Avenue. Since 24 of these uses are in the Project area, which is limited to three square blocks within the entire City of New York, there will be a reduction of only 33% in sex-related uses in the midtown Manhattan area. Thus 48 sex-related uses would remain in the midtown area alone. These figures, moreover, do not take into account possibilities for relocation by businesses displaced from the Project area or concentrations of sex-related uses in other areas of Manhattan and in the other boroughs.
 
 
 44
 Appellant cannot seriously question any of these material and significant facts. It seeks to maximize the Project's impact, however, by arguing that it would reduce by 79% the number of sex-related establishments within a three-block radius around the Project area. However, the relevant area for present purposes is much larger, extending at least to midtown Manhattan (i.e., from 33rd to 59th Streets) where a large number of sex-related uses would continue to exist. In an effort to counter the insubstantiality of the overall reduction in sex-related uses that would result from the Project appellant asks us, in judging the Project's effect, to distinguish between specific types of use (e.g., book stores, peep shows, adult movies, topless bars, swingers' clubs) rather than consider them collectively, and points out that in filing for building permits there are different requirements for some of these uses. Appellant argues that, depending on the size of the midtown area that is used as the yardstick, the diminution in some specific uses caused by the Project would be greater than that shown by Chairman Stern's figures (see FEIS Figure 2-15).
 
 
 45
 We do not believe that such use-fragmentization is constitutionally mandated or that the extent to which a governmental action in the public interest incidentally burdens speech must be judged by the most adversely affected specific use, as distinguished from other closely related uses. When the availability outside the Project area of adult movies and live shows is added to that of book stores, peep shows and multiple uses, any diminution in access to such materials wrought by the Project would not be of constitutional significance. But even if the effect were assessed on a specific-use basis the restriction would not be sufficient to label it unconstitutional. FEIS Figure 2-15 shows that in June 1983 there were nine book stores, peep shows and multiple uses in the midtown Manhattan area, outside of the Project area itself. This figure does not take into account the number of such establishments in other parts of New York City or anticipated relocations from the Project area. In short, since the Project area presently supports 15 such businesses the law of supply and demand may be expected to lead to their appearance elsewhere.
 
 
 46
 Appellant responds that it will be prevented from effectively relocating by a New York zoning regulation which provides that establishments with four or more coin-operated amusement devices may locate only in areas zoned for amusement arcades. This contention must be rejected; the Constitution does not entitle a person to distribution of information in precisely the same form as that in use by the least expensive means of expression, as long as a comparable method is available. Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority, 745 F.2d 767, 774 (2d Cir.1984); see also Heffron v. International Society For Krishna Consciousness, Inc., 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981). Appellant has available to it numerous other unrestricted means of exhibition, including use of machines that are not coin-operated, books, magazines, movies, video cassettes and live shows purveying the same information.
 
 
 47
 For the foregoing reasons the complaint was properly dismissed as a matter of law upon the undisputed facts. Our affirmance of the district court's dismissal of the complaint carries with it an affirmance of its denial of preliminary injunctive relief. Since appellant failed to show either probable success on the merits or a combination of serious questions going to the merits and a balance of hardships tipping toward appellant, there was no abuse of discretion in denying such relief, Citibank, N.A. v. Citytrust, 756 F.2d 273, 275 (2d Cir.1985); Sierra Club v. Hennessy, 695 F.2d 643, 649 (2d Cir.1982); Triebwasser & Katz v. A.T. & T., 535 F.2d 1356, 1358 (2d Cir.1976).
 
 
 48
 The order of the district court is affirmed.
 
 
 
 [1]
 At the December 12, 1984 hearing on defendant's motion to dismiss, defendants argued that any FEIS statements suggesting that businesses of the sort run by plaintiffs would be excluded from the Project's retail establishments upon completion of the Project were merely "predictions" as to what mix of uses would be produced by independent market forces
 
 
 [2]
 The district court summarily denied plaintiffs' March 1, 1985, motion for reargument of the February 5, 1985 order, which contended that (1) the district court had converted defendants' motion to dismiss without adequate notice to plaintiffs, and (2) plaintiffs had been deprived of an opportunity to prove the diminution of access to adult materials