UNITED MINE WORKERS OF AMERICA, DISTRICT 4, and Local Union 2258 United Mine Workers of America, Plaintiffs,

v.

CYPRUS EMERALD RESOURCES CORPORATION t/d/b/a Emerald Mines Company, Defendant.

Civ. A. No. 87–1650.

United States District Court, W.D. Pennsylvania.

March 3, 1988.

James C. Kuhn, III, Melvin P. Stein, Pittsburgh, Pa., for plaintiffs.

Henry Ingram, Thomas C. Reed, Buchanan, Ingersoll, P.C., Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

COHILL, Chief Judge.

### I. BACKGROUND

Presently before us is defendant Cyprus Emerald Resources Corporation's ("Cyprus") motion to dismiss this action on the grounds that (1) this court lacks jurisdiction; (2) the complaint fails to state a claim upon which relief may be granted; and (3) the applicable limitations period for this action has elapsed.

Cyprus installed a computer monitoring and control system ("computer system") at its mine in 1980. The computer system gathers and displays, on a computer screen, data concerning the operation of underground conveyor belts, fans, and carbon monoxide levels in the mine. The data are monitored, and useful information, such as reports of malfunctions, may be communicated to personnel elsewhere in the mine, who may then take appropriate action. The underlying dispute involves the allocation of the duty to monitor the computer, and communicate the data to underground workers.

There has been a series of arbitration awards leading up to this action. Plaintiff, United Mineworkers of America, District 4 and Local Union 2258 ("Union"), initially argued before Arbitrator Robert A. Creo in 1983 that the operation and monitoring of the computer system fell entirely within the duties reserved to bargaining unit employees under the Union's contract. The National Bituminous Coal Wage Agreement of 1984, Article IA, Sections (a) & (b), provides that certain tasks are reserved to Union personnel:

Article IA—SCOPE AND COVERAGE

Section (a) Work Jurisdiction

The production of coal, including removal of overburden and coal waste, preparation, processing and cleaning of coal and transportation of coal (except by waterway or rail not owned by Employer), repair and maintenance work normal-

ly performed at the mine site or at a central shop of the Employer and maintenance of gob piles and mine roads, and work of the type customarily related to all of the above shall be performed by classified Employees of the Employer covered by and in accordance with the terms of this Agreement. Contracting, subcontracting, leasing and subleasing, and construction work, as defined herein, will be conducted in accordance with the provisions of this Article.

. . . .

Section (b) Exemptions Clause

It is the intention of the Agreement to reserve to the Employers and except from this Agreement an adequate force of supervisory employees to effectively conduct the safe and efficient operation of the mines and at the same time, to provide against the abuse of such exemptions by excepting more such employees than are reasonably required for that purpose.

The language of the contract in force at the time of Arbitrator Creo's decision was virtually identical to the language of the 1984 contract in effect at the time this action was commenced (the most recent contract went into effect in January, 1988). *See* First Creo Arbitration Award, at 7 (Oct. 14, 1983).

Arbitrator Creo held that the Union contract did allocate to bargaining unit personnel the right to monitor the computer system for information about conditions in the mine, and to report the information to other employees working underground. First Creo Arbitration Award, at 12–13. Arbitrator Creo reasoned that:

There is no reason to presume computers can not assist bargaining unit personnel by *direct* involvement in the production of coal. In the present case, the computer monitoring must be properly viewed as another tool or piece of machinery involved in the output of coal.

This does not necessarily mean, however, that a job must be posted whose sole function is to monitor the computer console and communicate with underground personnel.

*Id.* at 12.

Subsequently, Cyprus installed an additional computer screen at the "Hoist House," where the Union "Hoist operator" could monitor the system with the aid of an audible alarm. In the event of a malfunction, the Hoist operator could alert the appropriate operators and cancel the alarm message on the screen. Management employees retained control of access to the computer through a keyboard located some distance from the Hoist House, and continued to receive data through a separate computer screen and printer. Second Creo Arbitration Award, at 2 (August 30, 1984).

The Union then petitioned to gain control of keyboard access and the printer, arguing that these were an integral part of the monitoring system, and should be under exclusive Union control. Arbitrator Creo disagreed, and offered the following clarification of his earlier award:

Although there is language in the Opinion of October 14, 1983 susceptible to the broad interpretation advocated by the Union, the Award is, however, limited to monitoring and communicating functions. The Arbitrator found an infringement in negotiated work jurisdiction when salaried personnel [were] exclusively monitoring the belt system and telephoning production personnel to advise them on malfunctions. The Arbitrator was persuaded and convinced that this was identical to a non-computer system such as electrical lights, video cameras or television screens. In terms of the purpose and end result, no significant difference between a computer based technology and a more traditional technology exist regarding monitoring functions. The Arbitrator finds that neither the keyboard nor the printouts are vital aspects of the monitoring function nor within UMWA jurisdiction. The system as presently constituted does not violate the work jurisdiction of the Union. The operating procedures now in effect are functioning as the eyes, ears and voice. Immediate access to the printout as memory is not

such an integral aspect of the monitoring functions as to require an on-site printer. Access to the keyboard and programming is clearly technical in nature and beyond the scope of the original Award of October 14, 1983.

Second Creo Arbitration Award, at 3. Arbitrator Creo thus approved the dual-screen computer system.

The computer system continued to be a point of contention, however. The Union initiated further grievance procedures in 1985, alleging that management personnel were preempting the monitoring function allocated to bargaining unit personnel. Arbitrator Samuel S. Stone issued a decision on June 30, 1986. Arbitrator Stone made clear that Arbitrator Creo's reasoning encompassed the monitoring and communication of data from fans and carbon monoxide levels, in addition to the data from the belt system. Stone Arbitration Award, at 20 (June 30, 1986). Arbitrator Stone reasoned that:

It is the nature of the work performed and not the equipment used to perform the work which determines work jurisdiction. The monitoring work involved is work that replaces functions performed by classified [i.e. Union] Employees manually previously. The monitoring work is not technical or complex. The Employer can certainly reduce the number of classified Employees by employing computer capabilities; however, it cannot remove the underlying functions from the exclusive work jurisdiction of classified Employees. Classified Employees have exclusive work jurisdiction over the monitoring functions performed by them previously. The fact that an appropriate job title is not contained in the appropriate Appendix to the National Agreement is irrelevant.

*Id.* at 21. Arbitrator Stone emphasized this point and then explained that the line between the provinces of Union and non-Union personnel is not always clear:

There are certain monitoring functions which fall within the exclusive work jurisdiction of classified Employees and there are certain monitoring functions which do not. The key is whether the monitoring function is replacing a function performed by classified Employees previously. Certainly the Employer has the reserved management prerogative to monitor functions to effectively conduct the safe and efficient operation of the mine. However, when the Employer does so in such a fashion as to replace functions previously falling within the exclusive work jurisdiction of classified Employees, the Employer has violated the National Agreement. *The line of demarcation for the aforesaid monitoring functions may not always be clear and the particular facts and circumstances of each case will have to be examined.*

*Id.* at 22 (emphasis added). Based on the evidence before him, Arbitrator Stone found that Cyprus had violated the NBCWA

by allowing supervisory Employees to monitor belts, fans and carbon monoxide and communicate information concerning same. I will order the Employer to cease said violations. I have insufficient evidence to make a compensation award. More specifically, I have insufficient evidence as to who had a right to the work involved, as to whether any classified Employee was deprived of a work opportunity and as to the amount with a reasonable amount of certainty.

*Id.* at 23. Arbitrator Stone's award ordered Cyprus to "cease allowing supervisory Employees to monitor belts, fans and carbon monoxide and communicate information concerning same to the extent same replaces those functions performed by classified Employees previously." *Id.*

The dispute was subsequently revived before Arbitrator David T. Kennedy, when Cyprus decided to eliminate the Hoist Operator position on the second shift because there was no need for hoisting on that shift. The Union initiated a grievance procedure. Arbitrator Kennedy identified three issues before him:

1. Can the hoist operator job be eliminated?

2. Can the [computer] monitoring duties be assigned to other classified personnel?

3. Do such other classified personnel have the ability and capacity to perform the [computer] monitoring duties?

Kennedy Arbitration Award, at 13 (February 5, 1987). Arbitrator Kennedy answered all three questions in the affirmative, and denied the grievance. Arbitrator Kennedy took note, however, that "[t]he Union witnesses testified that supervisory employees communicate information concerning the results of monitoring." *Id.* at 14. Therefore, Arbitrator Kennedy directed Cyprus to cease this practice "if the same is being done at this time." *Id.* at 14–15.

This action followed. In its complaint, the Union alleges that Cyprus "has failed and refused to cease allowing exempt, supervisory employees to monitor belts, fans and carbon monoxide and communicate information concerning same in replacement of the responsibility of bargaining unit employees to do the same." Complaint ¶ 11. The Union requests this Court to "adjudge Defendant to be in violation of the final and binding orders of Arbitrators Kennedy and Stone," and issue an injunction enforcing the Kennedy and Stone orders. Cyprus subsequently filed its motion to dismiss.

## II. LIMITATIONS PERIOD

We begin by considering whether this action is timely filed. Cyprus has argued that it is not. We take it that the Union is not *appealing* the arbitration decisions. Instead, the Union seeks *enforcement* of the arbitration awards, invoking section 301 of the National Labor–Management Relations Act ("NLRA"), 29 U.S.C. § 185.

Section 10(b) of the NLRA [29 U.S.C. § 160(b)] provides a six-month limitations period for actions alleging unfair labor practices. In *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the United States Supreme Court held that the six-month limitations period set forth in section 10(b) applied to a so-called "hybrid" action brought by an employee against both his employer and his union. In *Del-Costello*, the employee alleged that his employer had breached its collective bargaining agreement, and that his union had breached its duty to fairly represent him in his unsuccessful grievance procedure. The Court of Appeals had decreed that the applicable state statutes provided a 90-day limitations period for the claim against the employer, and a 3-year limitations period for the claim against the union. 462 U.S. at 157, 103 S.Ct. at 2286, 76 L.Ed.2d at 484. The Court found that the state limitations periods were unsatisfactory for a number of reasons, including the lack of a close analogue in state law, 462 U.S. at 165, 103 S.Ct. at 2291, 76 L.Ed.2d at 489, and the unrealistically short 90-day limitations period, 462 U.S. at 166, 103 S.Ct. at 2291, 76 L.Ed.2d at 490.

Subsequently, in *Taylor v. Ford Motor Co.*, 761 F.2d 931 (3d Cir.1985), an employee brought a "hybrid" action against his employer and his union, this time seeking enforcement of an arbitration award. The Third Circuit Court of Appeals applied section 10(b)'s six-month limitations period, noting that "it is precisely the hybrid nature of Taylor's lawsuit that mandates the application of *DelCostello*." *Taylor*, 761 F.2d at 933 n. 2. *See also Samples v. Ryder Truck Lines, Inc.*, 755 F.2d 881, 886–87 (11th Cir.1985) (characterizing an employee's suit to enforce an arbitration award against his employer as a "hybrid" suit, even though the employee had not asserted a claim against his union, and applying the six-month limitations period in section 10(b)).

Since *DelCostello*, a number of courts have struggled with the question of whether the six-months limitations period in section 10(b) applies to various "pure" actions under section 301. For example, in *Clark v. Local 95, International Union of Operating Engineers*, 588 F.Supp. 1371 (W.D. Pa.1984), we held that section 10(b)'s limitations period applied to an employee's lawsuit against his union for an alleged breach of the duty of fair representation. More recently, the Third Circuit Court of Appeals has held that another "pure" section 301 action, a lawsuit by an employee against

his union for an alleged breach of the union's constitution, was subject to section 10(b)'s six-month limitations period. *Lewis v. International Brotherhood of Teamsters, Local 771*, 826 F.2d 1310, 1316 (3d Cir.1987). The Third Circuit Court has also held that section 10(b) applies to "pure" section 301 actions to compel arbitration, brought by a union against an employer. *Federation of Westinghouse Independent Salaried Unions v. Westinghouse Electric Corp.*, 736 F.2d 896 (3d Cir.1984); *see also International Ass'n of Mach. v. Allied Products Corp.*, 786 F.2d 1561 (11th Cir. 1986); *Teamsters Union v. Great Western Chemical Co.*, 781 F.2d 764 (9th Cir.1986); *Gohr Distributing Co. v. Teamsters Local # 264*, 657 F.Supp. 415 (W.D.N.Y.1987).

However, those courts which have considered whether the limitations period in section 10(b) applies to "pure" section 301 lawsuits, brought by a union to enforce an arbitration award against the employer, have consistently held that section 10(b) does not apply. *Sheet Metal Workers International Association, Local Union 150 v. Systems Engineering, Inc.*, 831 F.2d 1509 (9th Cir.1987); *Derwin v. General Dynamics Corp.*, 719 F.2d 484 (1st Cir. 1983). Both of these courts rejected the one-year limitations period in the Federal Arbitration Act, 9 U.S.C. § 9, in favor of a state statute of limitations. In *Sheet Metal Workers*, the Ninth Circuit Court applied the state of Washington's one-year limitations period for confirmation of arbitration awards. 831 F.2d at 1514. In *Derwin*, the First Circuit Court decided that the appropriate limitations period was either Massachusetts' six-year limitations period for contract actions, or its twenty-year limitations period for enforcement of judgments, but declined to choose between the two, because the action was timely filed in either case. 719 F.2d at 490 n. 6.

A related line of cases dictates that state law provides the appropriate limitations period for affirmative defenses to actions to enforce arbitration awards. In *Chauffeurs, Teamsters, Warehousemen, and Helpers, Local Union 135 v. Jefferson Trucking Co.*, 628 F.2d 1023 (7th Cir.1980), *cert. denied*, 449 U.S. 1125, 101 S.Ct. 942, 67 L.Ed.2d 111 (1981), the Seventh Circuit Court held that the company's affirmative defense attacking the validity of the arbitration award was time-barred, because the company had not sought to vacate the award within the 90–day limitations period provided by state law. *International Union of Electrical, Radio and Machine Workers v. Ingram Mfg. Co.*, 715 F.2d 886, 890 (5th Cir.1983), *cert. denied*, 466 U.S. 928, 104 S.Ct. 1711, 80 L.Ed.2d 184 (1984), decided after *DelCostello*, the court held that Texas' catch-all four-year limitations period applied to the company's affirmative defenses.

The Third Circuit Court has not considered the appropriate limitations period for "pure" section 301 lawsuits to enforce arbitration awards since *DelCostello*. However, prior to the United States Supreme Court's landmark decision in *DelCostello*, the Third Circuit Court of Appeals considered whether the Pennsylvania Arbitration Act, or the Federal Arbitration Act, contained the appropriate limitations period for an action to "confirm" an arbitration award, brought pursuant to section 301. *Service Employees International Union, Local No. 36 v. Office Center Services, Inc.*, 670 F.2d 404 (3d Cir.1982). The Third Circuit Court concluded that the Pennsylvania statute contained the appropriate limitations period, 670 F.2d at 408, and in passing noted that the Federal Arbitration Act probably would not have any bearing on suits to enforce arbitration agreements, also brought pursuant to section 301, 670 F.2d at 407 n. 6. The Pennsylvania limitations period was one year. *Id.* at 410 (citing 5 Pa.Stat.Ann. § 169 (superseded)); *accord International Union of Electrical Workers v. Westinghouse Electric Corp.*, 455 F.Supp. 392, 396 (W.D. Pa.1978). The controlling statute in *Service Employees* provided:

At any time within one year after the award is made any party to the arbitration may apply to the court having jurisdiction for an order confirming the award, and thereupon the court shall grant such an order, unless the award is vacated, modified, or corrected as pre-

scribed in the next two sections. Notice in writing of the application shall be served upon the adverse party or his attorney five days before the hearing thereof.

5 Pa.Stat.Ann. § 169 (superseded). That statute has been superseded by 42 Pa.C.S.A. § 7313, which provides:

> On application of a party, the court shall confirm an award, unless within the time limits imposed by this subchapter, grounds are urged for vacating or modifying or correcting the award, in which case the court shall proceed as provided in section 7314 (relating to vacating award by court) or section 7315 (relating to modification or correction of award by court).

The superseded version clearly confined enforcement, or "confirmation," actions to a one-year limitations period. The current version lacks a specific limitations period for enforcement actions. Yet, in view of the federal policy favoring speedy resolution of labor arbitration disputes, some reasonable limitations period must apply. *See United Parcel Service v. Mitchell*, 451 U.S. 56, 64, 101 S.Ct. 1559, 1564, 67 L.Ed.2d 732, 741 (1981). Pennsylvania does have a residual six-year statute of limitations, 42 Pa.C.S.A. § 5527, similar to the four-year "catch-all" statute applied in *Ingram*, 715 F.2d at 890. In our opinion the residual statute of limitations is not appropriate because (1) the residual statute cannot be termed "analogous" to section 301; and (2) six years is an excessively long period. *See Mitchell*, 451 U.S. at 64, 101 S.Ct. at 1565, 67 L.Ed.2d at 741.

Nor will we follow the lead of the First Circuit Court in *Derwin*, and apply Pennsylvania's four-year limitations period for contract actions, 42 Pa.C.S.A. § 5525, or Pennsylvania's four-limitations period for actions on a judgment. *Id.* at § 5525(5). In our view, neither of these are sufficiently analogous.

Finally, the 30–day Pennsylvania limitations periods for requesting vacation, modification, or correction of an arbitration award, 42 Pa.C.S.A. §§ 7314 & 7315, are not appropriate because (1) they are too short, *see DelCostello*, 462 U.S. at 168, 103 S.Ct. at 2292, 76 L.Ed.2d at 491; and (2) Pennsylvania's statutory scheme draws a careful distinction between actions to vacate, and actions to confirm, arbitration awards, *compare* 42 Pa.C.S.A. §§ 7314 & 7315 *with* 42 Pa.C.S.A. § 7313.

When the Third Circuit Court in *Service Employees* chose to apply the state statute then-controlling confirmation of arbitration awards, it chose a closely analogous state action, just as the Ninth Circuit Court recently did in *Sheet Metal Workers*. There is no longer a close analogue in Pennsylvania law.

Since Pennsylvania law no longer provides an analogous limitations period, we conclude that the applicable limitations period must be supplied by federal law. *DelCostello*, 462 U.S. at 172, 103 S.Ct. at 2294, 76 L.Ed.2d at 493 ("when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking, we have not hesitated to turn away from state law"). Many courts have refused to adopt the limitations period contained in the Federal Arbitration Act. *See, e.g., Ingram*, 715 F.2d at 889. Indeed, the Act contains language exempting contracts of employment of workers engaged in interstate commerce. 9 U.S.C. § 1.

■ Therefore, by process of elimination, we conclude that the applicable limitations period is the six-month limitations period supplied by section 10(b). We are satisfied that this result provides a suitable limitations period. First, there is a "family resemblance" between a "pure" section 301 action to enforce a labor arbitration award, and an unfair labor practice claim, governed by section 10(b). *See DelCostello*, 462 U.S. at 170, 103 S.Ct. at 2293, 76 L.Ed.2d. at 493. Secondly, this action to enforce a labor arbitration award bears a certain resemblance to other "pure" section 301 actions to which section 10(b) has been applied. *See, e.g., Westinghouse*, 736 F.2d

896 (section 10(b) applies to action to compel arbitration).

■ Of course, the six-month limitations period does not mean that an arbitration award loses its effectiveness six months after it is awarded. All periods of limitation commence at the time the cause of action accrues. Federal law determines when a federal cause of action accrues. *Clark v. Local 95, International Union of Operating Engineers*, 588 F.Supp. 1371, 1374 (W.D.Pa.1984). A cause of action under section 301 accrues when plaintiff becomes aware, or should have become aware, of the possibility that an action could be maintained. *Id.; see also Ross v. Johns–Manville Corp.*, 766 F.2d 823, 826 (3d Cir.1985) (similarly, under Pennsylvania law, cause of action accrues "at the occurrence of the final significant event necessary to make the claim suable"). An action to enforce an arbitration decision accrues when it becomes or should become evident that one of the parties is violating or ignoring the decision.

In this instance, an action to enforce the arbitration awards issued by Arbitrator Stone and Arbitrator Kennedy would accrue at the time that the Union became or should have become aware of the alleged violation of the awards. That is the "final significant event necessary to make the claim suable." *Ross*, 766 F.2d at 826. The limitations period began to run at that time.

The Union's complaint does not allege a specific time at which the arbitration awards were violated. However, the Union is complaining of certain behavior, which it claims violated both the Stone and Kennedy awards. Therefore, we will assume for the purposes of this analysis that the behavior did not pre-date the latter award, and that the Union's claim accrued after Arbitrator Kennedy's award. We will use Arbitrator Kennedy's award as a benchmark for calculating the limitations period.

The Union's complaint was filed in this Court on August 6, 1987. Arbitrator Kennedy's award was submitted on February 5, 1987. Since the NLRA does not contain its own time computation rule, the limitations period is calculated according to Rule 6(a) of the Federal Rules of Civil Procedure. *See Frey v. Woodard*, 748 F.2d 173, 175 (3d Cir.1984). Rule 6(a) provides that:

> In computing any period of time prescribed or allowed by these rules, by the local rules of any district court, by order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included....

According to our calculation, the Union's complaint was filed within 6 months of Arbitrator Kennedy's decision, as defined by Rule 6(a). Therefore, the Union's claim is no more than six months old and is timely filed.

## III. SUBSTANTIVE ANALYSIS

■ An arbitration award is judicially enforceable if it is "sufficiently specific as to be capable of implementation." *United Mine Workers District No. 5 v. Consolidation Coal Co.*, 666 F.2d 806, 810 (3d Cir. 1981). The court may not preempt the fact-finding function of the arbitration process, and thus will not attempt to enforce an arbitration award that is "vague or ambiguous in meaning or effect." *Id.* The activity complained of must be the same as that addressed by the arbitration award. *Id.* at 811. *See generally District 12, United Mine Workers of America v. Peabody Coal Co.*, 602 F.Supp. 240, 242–43 (S.D.Ill.1985) (reviewing case law and declining to enforce a nine year old arbitration award because the court could not determine with positive assurance that the facts at hand were the same as those underlying the arbitration award).

The Third Circuit Court's decision in *Consolidation Coal Co.* is particularly relevant, because it involved a factual scenario very similar to that presented here. In *Consolidation Coal Co.*, the Union and the employer had previously arrived at a settlement agreement during the course of a greivance-arbitration procedure. 666 F.2d at 810. Settlement agreements are treated as arbitration awards for enforcement pur-

poses. *Id.* In the settlement agreement, the employer promised in general terms to comply with provisions of the national contract which prohibited the employer from contracting out "repair and maintenance 'customarily performed by classified employees' as long as the necessary equipment is available and the employees have the skill to do the work." *Id.* The Third Circuit Court held that the language of the settlement agreement was too broad and vague to be enforceable because, in order to enforce the settlement agreement, the court would have to first interpret its broad language, and then conduct extensive fact-finding to determine whether the agreement was intended to cover the factual situation before the court. *Id.* at 811–12. "If the court has any doubt, the parties should be returned to their grievance procedure and arbitration, for it is an arbitrator, and not the court, who is to decide whether the same issue has already been resolved in an earlier proceeding." *Id.* at 811.

The Union here alleges that "Defendant has failed and refused to cease allowing exempt, supervisory employees to monitor belts, fans and carbon monoxide and communicate information in replacement of the responsibility of bargaining unit employees to do the same." The Union therefore requests that we "adjudge Defendant to be in violation of the final and binding orders of Arbitrator Kennedy and Stone."

Arbitrator Stone's award ordered that Union personnel should use the computer to perform certain tasks which had been exclusively assigned to Union personnel in the past: monitoring and communicating information regarding belts, fans and carbon monoxide, to assist in the production of coal, a task assigned to the Union by section (a) of Article IA of the NBCWA. Stone Arbitration Award, at 23. Arbitrator Stone noted that management may use the same computer data for the purposes specified in section (b) of Article IA of the NBCWA: "to effectively conduct the safe and efficient operation of the mine." *Id.* at 22.

The essence of Arbitrator Kennedy's award is that the bargaining unit employee who monitors the computer may be someone other than the Hoist operator. Arbitrator Kennedy noted that "Union witnesses testified that supervisory employees communicate information concerning the results of monitoring. If this is being done, it is a violation of Arbitrator Stone's ruling," Kennedy Arbitration Award at 14, and conditionally directed the defendant to "cease allowing duties allocated to classified employees in that opinion to be performed by exempt employees, *if* the same is being done at this time." *Id.* at 14–15 (emphasis added).

Underlying both the Stone and Kennedy awards, and the Creo awards before them, is a very general principal: bargaining unit employees and supervisory employees may each use the computer to perform the tasks reserved to each of them by Article IA of the NBCWA. Both the Kennedy and Stone awards clearly state that both supervisory and union personnel may monitor the computer data, and may even communicate the data, but for different purposes. As Arbitrator Stone observed, "The line of demarcation for the aforesaid monitoring functions may not always be clear and *the particular facts and circumstances of each case will have to be examined.*" Stone Arbitration Award, at 22 (emphasis added).

█ In our view, neither Arbitrator Kennedy nor Arbitrator Stone made specific factual findings amenable to enforcement by this court. *See Consolidation Coal Co.*, 666 F.2d at 810. Arbitrator Kennedy, in particular, raised the. issue that management might have communicated certain information in violation of Arbitrator Stone's award, but did not explore the issue and made factual findings. The Union has made factual allegations which must be explored before an arbitrator. *See id.* Fact-finding by an arbitrator is particularly desirable here, because of the overlapping usefulness of the computer data to supervisory and bargaining unit personnel. Under such circumstances, a court order "enforcing" the awards would serve no useful

purpose; indeed, it would do little more than further muddy the waters. We will remand this case to the arbitrator for further proceedings. *See United Paperworkers Internation Union, AFL–CIO v. Misco, Inc.,* —— U.S. ——, —— n. 10, 108 S.Ct. 364, 372 n. 10, 98 L.Ed.2d 286, 300 n. 10 (1987).

## IV. CONVERSION TO MOTION FOR SUMMARY JUDGMENT

Since we have examined materials other than the pleadings (i.e. the arbitration awards and the NBCWA) to reach our decision, we have effectively converted the defendant's motion to dismiss into a motion for summary judgment, which is resolved by our decision to remand for further arbitration. *See* Fed.R.Civ.P. 12(b). All parties must have some notice, actual or constructive, when a motion to dismiss is converted into a motion for summary judgment. The critical question is whether the opposing party had effective notice that the motion might be converted into a motion for summary judgment, or whether the opposing party would instead be "taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings. Resolution of this issue will necessarily depend largely on the facts and circumstances of each case." *In re G. & A. Books, Inc.,* 770 F.2d 288, 295 (2d Cir.1985). *See also Sprague v. Fitzpatrick,* 546 F.2d 560, 563 (3d Cir.1976).

Since plaintiff submitted the NBCWA and the Stone and Kennedy arbitration awards as exhibits attached to its complaint, it cannot have been surprised that we considered these materials in the course of deciding defendant's motion. Furthermore, since the basis of our decision is that the arbitration awards are not amenable to the enforcement plaintiff seeks, there is no other pertinent material to be submitted. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 273 (1986) (there can be "no genuine issue as to any material fact" if a party has failed to establish an essential element of his claim). We see no reason to defer ruling on this motion while the parties spend precious time and money putting extraneous material into the record.

An appropriate order will issue.

### ORDER

AND NOW, to-wit, this 3rd day of March, 1988, for the reasons stated above, IT IS HEREBY ORDERED, ADJUDGED and DECREED that defendant's Motion to Dismiss be and hereby is converted to a Motion for Summary Judgment pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, and the motion be and hereby is GRANTED in that the above-captioned case be and hereby is REMANDED to arbitration for further proceedings consistent with the foregoing Memorandum Opinion.