**INTELLIGENT DIGITAL SYSTEMS, LLC, Russ & Russ PC Defined Benefit Pension Plan, and Jay Edmond Russ, all individually and as assignees of Jack Jacobs, Robert Moe, Michael Ryan and Martin McFeely, Plaintiffs,**

v.

**BEAZLEY INSURANCE COMPANY, INC., Defendants.**

**No. 12–CV–1209 (ADS)(GRB).**

United States District Court, E.D. New York.

Nov. 27, 2012.

David P. Rosenthal, Esq., Massapequa, NY, Attorney for the plaintiffs.

Ira Levine, Esq., Great Neck, NY, Attorney for the plaintiffs.

DLA Piper U.S. LLP, by Christopher M. Strongosky, Esq., of Counsel, New York, NY, Attorneys for the defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

On March 3, 2012, the plaintiffs Intelligent Systems, LLC ("IDS"); Russ & Russ PC Defined Benefit Pension Plan ("the Plan"); and Jay Edmond Russ ("Russ"), all individually and as assignees of Jack Jacobs, Robert Moe, Michael Ryan and Martin McFeely, (all collectively "the Plaintiffs") commenced this action by filing a Complaint against the defendant Beazley Insurance Company, Inc. ("the Defendant"). The Plaintiffs seek a judgment directing the Defendant to indemnify their insureds, Jack Jacobs, Robert Moe, Michael Ryan and Martin McFeely (collectively, "the Insureds") under the Defendant's Directors, Officers and Company Liability Insurance Policy ("the D & O Policy") that was issued to Visual Management Systems, Inc. ("VMS") and its officers and directors. They also seek a judgment directing the Defendant to pay the sums owed by each of the Insureds to the Plaintiffs, arising from the action entitled *Intelligent Digital Systems, LLC, et al. v. Visual Management Systems, Inc. et al.*, E.D.N.Y. Case No. 09–CV–074 ("the Underlying Action"). The Plaintiffs assert that the Defendant's alleged basis for its disclaimer of coverage—the D & O Policy's "insured versus insured" exclusion—does not apply in this case.

Presently before the Court is a motion by the Defendant to dismiss the Complaint pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ.P.") 12(b)(6) for failure to state a claim. For the reasons set forth

below, the Court converts the Defendant's motion to one for summary judgment and denies the motion.

## I. BACKGROUND

### A. The Creation of the VMS Corporate Entity

VMS is a Nevada corporation with its principal place of business located in the State of New Jersey. In or about 2007, VMS and its subsidiaries were reorganized in a reverse merger transaction into a publicly-traded corporate shell known as Wildon Production, Inc. ("the Reverse Merger Transaction"). As a result of the transaction, VMS obtained control of Wildon Production, Inc. ("Wildon"), which was renamed "Visual Management Systems, Inc.," and the stockholders of VMS came to own more than 75% of the shares of Wildon.

Before the Reverse Merger Transaction, VMS maintained an "advisory board," which was comprised of five members. This advisory board was converted to a Board of Directors ("the Board") as part of the Reverse Merger Transaction, and those members who had served on the advisory board became Board directors. The Board was the only Board of Directors VMS had for itself and its affiliated entities. According to the Plaintiffs, "[t]he 'conversion' from an advisory board to a board of directors did not conform to standard corporate formalities" in that the shareholders of VMS did not elect its directors. (Pl. Opp., pg. 4.)

In its April 15, 2009 Securities and Exchange Commission ("SEC") Form 10–K public filing for the period ending December 31, 2008, VMS identified that Wildon's Bylaws, which were filed with the SEC on May 9, 2006, were operating as its currently effective bylaws. (Strongosky Decl., Exh. 1.) These Bylaws state, in relevant part, that "the first Board of Directors of the Corporation, and all subsequent Boards of the Corporation, shall consist of not less than one (1) and not more than nine (9) directors. The number of Directors may be fixed and changed from time to time by ordinary resolution of the shareholders of the Corporation." (Strongosky Decl., Exh. 10.)

The Bylaws further provide that "Directors will be elected at the annual meeting of shareholders and shall hold office until the annual meeting of the shareholders next succeeding his or her election, or until his or her prior death, resignation or removal." (Strongosky Decl., Exh. 10.) However, the Bylaws also stipulate that "[a] casual vacancy occurring in the Board may be filled by the remaining Directors" and that "[b]etween successive annual meetings, the Directors have the power to appoint one or more additional Directors but no more than 1/2 of the number of Directors fixed at the last shareholder meeting at which Directors were elected." (Strongosky Decl., Exh. 10.) In such cases, "[s]o long as he or she is an additional Director, the number of Directors will be increased accordingly." (Strongosky Decl., Exh. 10.)

The Plaintiffs contend that, as part of the Reverse Merger Transaction, VMS replaced Wildon's Bylaws with its Corporate Governance Guidelines ("the Guidelines"). Apparently, at one point, the Guidelines were on VMS's only website, which operated as the website for all of VMS's entities. By its own terms, the Guidelines were developed and adopted by the Board "to assist the Board in the exercise of its responsibilities and to best serve the interests of the Company and its shareholders." (Russ Decl., Exh. H.) To that end, the Guidelines stipulate that they "should be interpreted in the context of the applicable laws and the Company's articles of incor-

poration, code of regulations and other corporate governance documents." (Russ Decl., Exh. H.) Moreover, "[t]he Guidelines are intended to serve as a flexible framework with which the Board may conduct its business and not as a set of legally binding obligations." (Russ Decl. Exh. H.)

With respect to the "Board Composition and Director . Qualifications," the Guidelines provide, in relevant part, the following guidance:

> The Company's Code of Regulations provides that all of the directors will be elected annually.... The Nominating and Corporate Governance Committee is responsible for reviewing with the Board, on an annual basis, the appropriate skills and characteristics of Board members as well as the composition of the Board as a whole.... Nominees for the Board will be selected by the Nominating and Corporate needs of the Board. Nominees for the Board will be selected by the Nominating and Corporate Governance Committee in accordance with the policies and principles in its charter.

> The number of directors is currently fixed, pursuant to the Company's Code of Regulations, at five. The directors believe that five members is an appropriate size for the Company's Board, but this will be reviewed and modified by the Board periodically to ensure that the Board can efficiently discharge its fiduciary duties and regulatory responsibilities.

(Russ Decl., Exh. H.)

### B. The Sale Transaction and Russ's Alleged Appointment to the Board

Russ is domiciled in the State of New York and is an attorney who is admitted to practice law in the State of New York. Russ is the founder of IDS, a Delaware limited liability company that has its principal place of business in the State of New York. IDS is the developer of certain source code and proprietary technology in the area of digital video recording for the security industry. In addition, IDS is the manufacturer and seller of a proprietary digital video recorder ("DVR"). IDS has two members: (1) Russ, who is the Managing Member of IDS, and (2) Jonnat Management Corp. ("Jonnat"), of which Russ is the sole shareholder and officer. Russ is also the President of Russ & Russ, P.C., which maintains the Plan. Russ is also the fiduciary of the Plan.

In or about 2007, IDS entered into a sale transaction with VMS ("the Sale Transaction"), which

> consisted generally of: (a) the sale by IDS to VMS of certain assets, including certain IDS's proprietary source code and technology assets, but not IDS's rights, if any, under certain pending patent applications; (b) a long-term consulting arrangement between VMS and Russ; (c) a non-managing membership interest of VMS in IDS Patent Holding Corp.; (d) the Development Agreement between VMS and a corporation owned by IDS's chief technology officer, Hosung Chang; and (e) a License of certain rights from IDS Patent Holding Corp. to VMS.

(Compl., ¶ 19.) To that end, IDS and VMS entered into a non-binding Letter of Intent in or about December 2007. In entering into this Letter of Intent, Russ and IDS relied upon VMS's August 31, 2007 and September 30, 2007 public filings of financial information.

Thereafter, on or about January 31, 2008, IDS and VMS executed a binding Letter of Intent with respect to the Sale Transaction. As part of the consideration for the Sale Transaction, IDS and VMS agreed that "[t]he Management of VMS shall present Jay Edmond Russ to the

Nominating Committee of the Board of Directors of VMS with the full endorsement of the management for selection as a new member of such Board." (Strongosky Decl., Ex. 1.) Once again, in entering into this Letter of Intent, Russ and IDS relied upon VMS's publicly filed financial information.

On February 26, 2008, VMS held a meeting of the Board, which then had five members. Russ was present at the meeting. During the meeting, "Russ left the room, and after further discussion, upon motion duly made and seconded, the Board approved moving forward with the IDS transaction and appointing [ ] Russ to the Board [as the sixth member] if the [Sale] [T]ransaction was completed." (Strongosky Decl., Exh. 2.) It appears that VMS took no further procedural steps with respect to Russ's appointment to the Board, even after the completion of the Sale Transaction. However, VMS did acknowledge that Russ was a director on the Board in its June 16, 2008 SEC Form 8–K public filing and in its September 16, 2008 annual filing with the Nevada Secretary of State (Strongosky Decl., Exh. 3 and Exh. 4.)

On April 2, 2008, again relying upon VMS's publicly filed financial information, VMS, IDS and Russ closed the Sale Transaction. In connection with the Sale Transaction, the parties executed a number of agreements, including (1) an Asset Purchase Agreement; (2) a Development Agreement; and (3) a purchase-money Unsecured Convertible Promissory Note whereby VMS agreed to repay IDS the principal sum of $1,544,000 with interest. The parties also executed a Consulting Agreement, in which VMS agreed to retain Russ as a consultant. The Consulting Agreement stipulated that Russ was an "Independent Contractor[,] . . . not an employee of [VMS] or any of its subsidiaries or affiliates" and that nothing within the Consulting Agreement "shall be construed to create an employer-employee relationship between [VMS] and [Russ]." (Strongosky Reply Decl., Exh. 2.) By their terms, the agreements are governed by the laws of the State of New York and provide that any litigation arising from the Sale Transaction would be tried in the Federal or state courts located within the State of New York.

On April 8, 2008, six days after the closing of the Sale Transaction, VMS publically announced that its August 31, 2007 and September 30, 2007 financial statements, among others, "should not be relied upon because of errors that required a restatement of such financial statements." (Compl., ¶ 25.) Subsequently, on June 10, 2008, VMS and the Plan executed a promissory note under which VMS borrowed $267,192 from the Plan at an interest rate of 10% per annum. VMS used this money to repay a loan to Gordon Lenz, who was a client of Russ.

Eventually, VMS ceased making its payments to IDS and Russ under the Sale Transaction documents. At first, IDS and Russ did not declare the defaults and accelerate all the sums due, including the principal due under the Unsecured Convertible Promissory Note in the face amount of $1,544,00. (Compl., ¶ 27.) Then, on December 10, 2008, VMS breached its obligations under the promissory note to the Plan, which had matured and was fully due and owing. Two days later, on December 12, 2008, Russ resigned as a member of the Board, and VMS confirmed Russ' resignation in its December 15, 2008 SEC filing. (see Compl., Exh. C; Strongosky Decl., Exh. 5.) By the end of December 2008, VMS had failed to make any additional payments to the Plaintiffs, and on January 23, 2009, VMS admitted to its

unpaid obligations to the Plaintiffs in a public announcement.

### C. VMS's D & O Policy

On August 11, 2008, VMS submitted an application to renew the D & O Policy ("the Renewal Application"). As part of the Renewal Application, VMS completed a questionnaire in which it answered the question "since the last renewal, has the Applicant ... had any changes in the board of directors or senior management?" in the affirmative. (Compl., Exh. A.) In its Supplement to the D & O Policy Renewal Application, VMS stated that "Jay Edmond Russ was named to the company's Board of Directors." (Compl., Exh. A.) The Renewal Application was executed on behalf of VMS by Jason Gonzalez ("Gonzalez"), a member of the Board and the President and CEO of VMS.

In the Renewal Application, VMS agreed that those statements included in the Renewal Application and in the supplemental materials were "the basis of the contract should a policy be issued and have been relied upon by the insurer in issuing any policy." (Compl., Exh. A.) The Renewal Application further stipulated that "[t]his Application and materials submitted with it shall be retained on file with the Insurer and shall be deemed attached to and become part of the Policy if issued." (Compl., Exh. A.)

After receiving the Renewal Application, the Defendant renewed the D & O Policy with a policy period from September 28, 2008 until September 28, 2009. The D & O Policy provided insurance coverage to VMS and its officers and directors, including Russ. In addition to incorporating the Renewal Application and supplemental materials, the D & O Policy incorporated "any publicly available documents that are filed by [VMS] up to one year prior to the inception date of [the D & O] Policy with the Securities and Exchange Commission or for any similar federal, state, local or foreign regulatory agency[.]" (Compl., Exh. A.)

The D & O Policy defines "Insureds" to mean "the Directors and Officers and the Company." (Compl., Exh. A.) It defines "Directors and Officers" to mean, in relevant part, "all persons who were, now are, or shall be duly elected or appointed directors [.]" (Compl., Exh. A.)

Under Section III.F of the D & O Policy, VMS is excluded from coverage "for Loss in connection with or resulting from any Claim ... by, on behalf of, or at the direction of any of the Insureds[.]" (Compl., Exh. A.) There are five exceptions to this exclusion; two are potentially relevant to the present matter. First, there is an exception if the claim "is employment-related and brought by or on behalf of any of the Directors and Officers." (Compl., Exh. A.) The Plaintiffs allege that this exception applies in this case. Second, there is an exception if the claim

is brought by any former Directors and Officers who have not served in such capacity or as a consultant to the Company for at least four (4) years prior to the date such Claim is first made and who brings and maintains such Claim without any active assistance or participation of, or solicitation by, the Company or any other Directors and Officers or consultants to the Company who are serving or have served in such capacity within such four (4) year period.

(Compl., Exh. A.) Here, the Plaintiffs do not contend that this exception applies, because the Underlying Action was commenced approximately three months after Russ's resignation from the Board.

### D. The Defendant's Disclaimer of Coverage

On February 6, 2009, the Plaintiffs (1) declared VMS's defaults in writing; (2) accelerated all sums due; and (3) notified VMS, the Insureds and Gonzalez, of their claims and their imminent commencement of the Underlying Action. On that same date, February 6, 2009, VMS submitted its insurance claim to the Defendant via email. In the email, VMS identified Russ as "a former board member" and informed the Defendant that "Russ as a former board member (and practicing litigation attorney) could be a very thorny plaintiff. Especially since as a director he was given access to our D & O policy language (and in fact referred us to the broker who placed the policy)." (Griffin Decl., Exh. 3; see also Compl., (first) ¶ 31.)

By letter dated March 17, 2009, the Defendant responded to VMS's February 6, 2009 insurance claim. The Defendant noted that VMS's February 6, 2009 email identified Russ as a former director on the Board, which would make Russ an insured under the D & O Policy. Thus, the Defendant stated that it believed Exclusion III.F precluded coverage for Russ's claims against VMS and the other directors and officers. The Defendant requested that VMS provide it with the dates that Russ served as a director on the VMS board and for copies of the Consulting Agreement that had been entered into between VMS and Russ. On March 23, 2009, General Counsel for VMS, W. Geoffrey Martin, emailed the Defendant and notified it that "Russ was a member of our board of directors from April 3, 2008 [the date after the Sale Transaction closed] to December 12, 2008." (Griffin Decl., Exh. 1.)

By letter dated May 27, 2009, the Defendant informed VMS that coverage was not available in connection with the Underlying Action ("the Disclaimer Letter"). The Defendant asserted that Exclusion III.F was applicable, because Russ was a director on the Board from April 2008 until he resigned in December 2008.

### E. The Underlying Action

On March 10, 2009, the Plaintiffs commenced the Underlying Action to recover monetary damages against VMS, the Insureds and Gonzalez by filing a Complaint in the Eastern District of New York. This Complaint was subsequently amended on March 4, 2010.

On August 30, 2010, the court (Wexler, J.) issued an order granting the Plaintiffs summary judgment against VMS in connection with its breach of its contractual obligations under the two promissory notes and the Consulting Agreement. On September 30, 2010, a Judgment was entered in favor of the Plaintiffs for the full amount due under the two promissory notes and the Consulting Agreement. This amounted to $1,833,341.65 in favor of IDS, $326,370.18 in favor of the Plan and $304,144.17 in favor of Russ, plus pre and post judgment interest. To date, no portion of the judgment has been paid and it continues to accrue interest.

Following the entry of the Judgment, on November 8, 2010, VMS filed a petition for relief under Chapter 11 in the United States Bankruptcy Court for the District of New Jersey. Thereafter, on November 21, 2011, the case was converted to a Chapter 7 liquidation. In addition, on or about April 8, 2011, Gonzalez filed a petition for Chapter 13 relief in the United States District Court for the District of New Jersey. (E.D.N.Y. Case No. 09–CV–974, Dkt. No. 108.) Consequently, pursuant to 11 U.S.C. § 362, the automatic stay provision, the Underlying Action is stayed as to him.

On June 2, 2011, the court (Wexler, J.) directed the Plaintiffs and the Insureds to mediate before setting a date for trial. (E.D.N.Y. Case No. 09–CV–974, Dkt. No. 90.) The mediation was scheduled for July 20, 2011. By letter dated July 7, 2011, the Plaintiffs notified the Defendant that they "rejected" the Disclaimer Letter "in its entirety" and "request[ed] that [the Defendant] attend the mediation and participate in the mediation process." (Compl., Exh. E.) On July 12, 2011, the Defendant responded to the Plaintiffs' July 7, 2011 letter and stated that they would neither participate in nor attend the July 20, 2011 mediation. The Defendant also declined "to debate its coverage analysis with [the] [P]laintiffs'] counsel," except to note that "in addition to VMS' General Counsel's prior assertion that Russ was a director of VMS and the insurance application listing Mr. Russ as a director of VMS, VMS' SEC filings list [Russ] as a VMS director." (Compl., Exh. F.) On July 20, 2011, the Plaintiffs and the Insureds engaged in a full-day of mediation, but it was unsuccessful.

On September 15, 2011, the Insureds Moe, Ryan and Jacobs submitted to the Defendant a proposed Stipulation of Settlement that it had reached with the Plaintiffs for the Defendant's review and consent. By letter dated September 22, 2011, the Defendant notified Moe, Ryan and Jacobs that it was "not in a position to respond to [their] settlement consent request" because coverage was not available for the Underlying Action. (Compl., Exh. K.)

On October 6, 2011, the court (Wexler, J.) approved the Stipulation of Settlement reached between the Plaintiffs and the Insureds Moe, Ryan and Jacobs. As part of the Stipulation of Settlement, Moe, Ryan and Jacobs agreed to acknowledge their tort liability based upon their negligence in stated sums; to pay the sums owed; and to assign to the Plaintiffs their rights and claims against the Defendant. The Stipulation of Settlement required Moe, Ryan and Jacobs to only pay $70,000 collectively among the three of them, but stated settlement amounts that totaled $2.28 million. Subsequently, on November 17, 2011, the court (Wexler, J.) approved a Stipulation of Settlement reached by the Plaintiffs and Insured McFeely, who was pro se. The Stipulation of Settlement did not require McFeely to pay anything, but stated settlement amounts that totaled $2,463,756.

## F. The Instant Action and the Defendant's Motion to Dismiss

On March 12, 2012, the Plaintiffs, individually and as assignees of the Insureds, commenced the instant action against the Defendant by filing the Complaint in the United States District Court for the Eastern District of New York. As a result of the Stipulations of Settlement, which assigned the Insureds' alleged insurance coverage rights to the Plaintiffs, they seek insurance coverage for those claims which they asserted against the Insureds in the Underlying Action.

On May 11, 2012, the Defendant moved to dismiss the Plaintiffs' Complaint for failure to state a claim. Specifically, the Defendant alleges that no insurance coverage is available for the Plaintiffs' claims in the Underlying Action because Russ was a former director of VMS and the D & O policy explicitly excludes coverage for lawsuits brought against directors by or on behalf of other directors under the "insured versus insured" exclusion. The Defendant also asserts that the Plaintiffs' claims are barred by equitable estoppel, in that VMS represented that Russ was a director and the Defendant relied upon these misrepresentations to its detriment.

The Plaintiffs oppose the Defendant's motion on the grounds that (1) Russ was not duly appointed or elected to the Board; (2) the "insured versus insured" exclusion does not apply to Russ's consulting agreement claim, because it is employment-related; (3) the "insured versus insured" exclusion does not apply to IDS or the Plan's claims even if it applies to Russ's claims; (4) the "insured versus insured" exclusion does not apply absence a showing of collusion; and (5) the Defendant cannot invoke the doctrine of equitable estoppel because its reliance on VMS's representations concerning Russ's status as a director on the Board was unreasonable.

## II. DISCUSSION

### A. *Legal Standard*

It is well-established that a complaint should be dismissed under Fed.R.Civ.P. 12(b)(6) only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). In deciding whether a complaint meets this threshold, the Court is required to accept the material facts alleged in the complaint as true and draw all reasonable inferences in the Plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009). In its analysis, the Court may refer "to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *see also Karmilowicz v. Hartford Fin. Servs. Group*, 494 Fed.Appx. 153, 155–57, 2012 WL 3734449, *2–3, 2012 U.S.App. LEXIS 18394, *5–6

(2d Cir.2012). Only if this Court is satisfied that the complaint cannot state any set of facts that would entitle the Plaintiff to relief will it grant dismissal pursuant to Rule 12(b)(6). *Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2d Cir.1993).

Generally, under Fed.R.Civ.P. 12(d), where matters outside the pleadings are presented in connection with a Rule 12(b)(6) motion, "a district court must either 'exclude the additional material and decide the motion on the complaint alone' or 'convert the motion to one for summary judgment under Fed.R.Civ.P. 56 and afford all parties the opportunity to present supporting material.'" *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir.2000) (quoting *Fonte v. Bd. of Managers of Continental Towers Condo.*, 848 F.2d 24, 25 (2d Cir.1988)). When a district court decides to convert a Rule 12(b)(6) motion to a motion for summary judgment, the court must "give sufficient notice to an opposing party and an opportunity for that party to respond." *Hernandez v. Coffey*, 582 F.3d 303 (2d Cir.2009) (citation and internal quotation marks omitted). However, "formal notice is not required where a party 'should reasonably have recognized the possibility that the motion might be converted into one for summary judgment [and] was [neither] taken by surprise [nor] deprived of a reasonable opportunity to meet facts outside the pleadings.'" *Hernandez v. Coffey*, 582 F.3d 303 (2d Cir. 2009) (quoting *In re G. & A. Books, Inc.*, 770 F.2d 288, 295 (2d Cir.1985)).

In this regard, "[a] party cannot complain of lack of a reasonable opportunity to present all material relevant to a motion for summary judgment when both parties have filed exhibits, affidavits, counter-affidavits, depositions, etc. in support of and in opposition to a motion to dismiss." *In re G. & A. Books, Inc.*, 770 F.2d 288, 295

(2d Cir.1985). Thus, a district court need not give notice when it is converting a Rule 12(b)(6) motion into a Rule 56 motion when "it is clear from the record ... that [the parties] knew additional factual considerations were being considered and, in fact, responded with its own evidentiary submissions." *Reliance Ins. Co. v. Poly-Vision Corp.*, 474 F.3d 54, 57 (2d Cir.2007).

■ In this case, both the Defendant and the Plaintiffs have submitted a number of exhibits for the Court's consideration. "Because such exhibits are outside the pleadings, Rule 12(d) requires the court convert the [Defendant's] Rule 12(b)(6) motion to a motion seeking summary judgment." *Avrio Group Surveillance Solutions, Inc. v. Essex Ins. Co.*, 790 F.Supp.2d 89, 95 (W.D.N.Y.2011). Further, since the Plaintiffs are not proceeding *pro se* and both "[the] Plaintiff[s] and [the] Defendant submitted numerous exhibits to support their respective positions on [the] Defendant's motion," the parties had to be aware of the possibility that the Defendant's motion to dismiss might be converted to one for summary judgment. *Id.* at 96; *see also Villante v. Department of Corrections*, 786 F.2d 516, 521 (2d Cir. 1986). Indeed, in their Memorandum of Law, the Plaintiffs state that the Defendant "submitted documents that go outside 'the four corners' of the complaint' " and even provide a "Counter Statement of Facts." (Pl. Opp., pgs. 4, 7.) Accordingly, the Court converts the Defendant's Rule 12(b)(6) motion into a Rule 56 motion.

When deciding a motion for summary judgment pursuant to Fed.R.Civ.P. 56(c), the Court may not grant such a motion unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir.2006). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Paone v. Microsoft Corp.*, 881 F.Supp.2d 386, 393 (E.D.N.Y.2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam), and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989)).

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party to present "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmoving party may not then rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). If the evidence favoring the nonmoving party is "merely colorable ... or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

### B. *Choice of Law*

"In diversity jurisdiction cases, federal courts 'must look to the choice of law rules of the forum state.' " *Deutsch v. Novartis Pharms. Corp.*, 723 F.Supp.2d 521 (E.D.N.Y.2010) (citing *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998)). "In

New York 'the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws.' " *Id.*

In this case, the Plaintiffs argue that New York Law should apply, while the Defendant contends that New Jersey Law should apply. However, both the parties concede that there is no conflict between New York Law and New Jersey law on the issues presently before the Court. (*see* Pl. Opp., pg. 14; Def. Reply, pg. 2.) Thus, "no choice of law analysis is necessary" and the Court applies New York law. *Fed. Ins. Co. v. Am. Home Assur. Co.,* 639 F.3d 557, 566 (2d Cir.2011) (citation omitted).

### C. As to Whether the Defendant Has Met its Burden of Establishing as a Matter of Law that the "Insured Versus Insured" Exclusion Applies

The Defendant argues that because Russ is a former director of VMS, his claims against the Insureds are barred from coverage under the "insured versus insured" exclusion in the D & O Policy. In support of this argument, the Defendant relies on the unapproved draft minutes from the February 26, 2008 meeting of the Board; VMS's alleged Bylaws; VMS's Renewal Application; VMS's public filings; and the representations made by VMS's counsel when VMS first filed its insurance claim with the Defendant.

Conversely, the Plaintiffs assert that the "insured versus insured" exclusion does not apply in this case, because Russ was never duly elected or appointed to the Board. According to the Plaintiffs, the Guidelines replaced the Wildon Bylaws, fixed the Board at five members, and were never amended to expand the Board to six members so as to include Russ. Further, the Plaintiffs claim that at the February 26, 2008 Board meeting Russ was nominated but not elected to the Board and that

there was neither an election or appointment process nor any corporate documents duly appointing or electing Russ to the Board. The Plaintiffs also argue that (1) even if Russ was a duly appointed or elected director, the "insured versus insured" exclusion would still not apply to Russ's consulting agreement claim, as that claim is employment-related; (2) the "insured versus insured" exclusion does not apply to IDS or Russ, because they are separate legal entities; and (3) the "insured versus insured" exclusion does not apply in the absence of collusion.

For the reasons that follow, the Court finds that there are genuine issues of material fact only with respect to whether Russ was duly appointed as a director to VMS's Board and, thus, whether the "insured versus insured" exclusion applies.

#### 1. As to Whether Russ was Duly Appointed or Elected as a Director to VMS's Board

"The New York approach to the interpretation of contracts of insurance is to give effect to the intent of the parties as expressed in the clear language of the contract." *Fed. Ins. Co.,* 639 F.3d at 567 (citation omitted). Thus, courts "give unambiguous provisions of an insurance contract their plain and ordinary meaning" and will not "disregard the plain meaning of the policy's language in order to find an ambiguity where none exists." *Id.* (citation and internal question marks and altercations omitted). "On the other hand, under New York law, contract claims are generally not subject to summary judgment if the resolution of a dispute turns on the meaning of an ambiguous term or phrase." *Id.* "However, where language in a contract is ambiguous, summary judgment can be granted if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's inter-

pretation of the language." *Id.* (citation and internal quotation marks omitted).

"The question of whether the language of a contract is clear or ambiguous is one of law, and therefore must be decided by the court." *Id.* at 568 (citation and internal quotation marks omitted). In cases involving insurance contracts, "[l]anguage ... will be deemed ambiguous if reasonable minds could differ as to its meaning." *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir.1998); *see also Fed. Ins. Co.*, 639 F.3d at 567. Moreover, under "New York's well-established *contra proferentem* rule ... unresolvable ambiguities in insurance contracts are construed in favor of the insured." *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 615 (2d Cir.2001).

At issue in this case is the language in the D & O Policy's "insured versus insured" exclusion, which excludes from coverage "[l]oss in connection with or resulting from any Claim ... by, on behalf of, or at the direction of any of the Insureds[.]" (Compl., Exh. A.) Under the D & O Policy, the term "insureds" include "the Directors and Officers," which is defined, in relevant part, as "all persons who were, now are, or shall be duly elected or appointed directors[.]" (Compl., Exh. A.) Courts in their analysis of "insured versus insured" exclusions have found the term "duly" to be unambiguous and have understood "a person [to be] duly appointed or elected if 'the procedures by which he was elected were conducted in a due manner, time, and degree.'" *Julio & Sons Co. v. Travelers Cas. & Sur. Co. of Am.*, 684 F.Supp.2d 330, 337 (S.D.N.Y.2010) (quoting *Sphinx Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 412 F.3d 1224, 1229 (11th Cir. 2005)); *see also Wojtunik v. Kealy*, No. CV–03–2161–PHX–PGR, 2011 WL 1211529, at *3, 2011 U.S. Dist. LEXIS 36229, at *10 (D.Ariz. Mar. 31, 2011).

In this case, neither the Plaintiffs nor the Defendant seem to actually contest that the language of the D & O policy requires a director to be duly elected or appointed in order to be considered an "insured." Rather, the parties have presented evidence and arguments focusing on whether or not Russ was actually duly appointed or elected to the Board. In doing so, they have raised genuine issues of material fact as to what procedures were in place at the time Russ was allegedly elected to the Board and whether VMS properly complied with those procedures. For example, the Defendant argues that VMS adopted Wildon's Bylaws following the Reverse Merger Transaction and that those Bylaws were in place and were complied with during the February 26, 2008 Board meeting. On the other hand, the Plaintiffs contend that Wildon's Bylaws were replaced by the Guidelines following the Reverse Merger Transaction and that VMS did not comply with these Guidelines when it attempted to elect Russ to the Board. The parties also disagree on the reliability of the February 26, 2008 draft board minutes; whether Russ was "elected" to the Board or simply "nominated" at the February 26, 2008 Board meeting; and whether VMS's Board needed to take any additional action after the completion of the Sale Transaction in order to effectuate Russ's appointment.

Accordingly, as genuine issues of material fact exist with respect to whether Russ was duly appointed or elected to the Board, the Court finds that it would be inappropriate to grant summary judgment in favor of the Defendants on this ground. *See Connolly v. Peerless Ins. Co.*, 873 F.Supp.2d 493, 501 (E.D.N.Y.2012) ("It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury not for the court on a

motion for summary judgment.' ") (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir.1997)).

### 2. As to Whether Russ's Consulting Agreement Claim is Employment–Related

■ In opposition to the Defendant's motion, the Plaintiffs contend, for the first time, that Russ's consulting agreement claim is employment-related, and therefore, even if the "insured versus insured" exclusion was applicable, this claim would be exempt under the employment-related exception, which provides that the "insured versus insured" exclusion will not apply if the claim "is employment-related and brought by or on behalf of any of the Directors and Officers." (Compl., Exh. A.) According to the Plaintiffs, the Underlying Action is employment-related because "Russ seeks enforcement of a consulting agreement between Russ and VMS." (Pl. Opp., pg. 14.) The Court disagrees.

The language of the Consulting Agreement clearly establishes that Russ was not an employee of VMS. Indeed, the Consulting Agreement specifically stipulates that Russ was an "Independent Contractor[,] ... not an employee of the [VMS] or any of its subsidiaries or affiliates" and that nothing within the Consulting Agreement "shall be construed to create an employer-employee relationship between [VMS] and [Russ]." (Strongosky Reply Decl., Exh. 2.) As such, Russ's consulting agreement claim is not employment-related. Therefore, the Court finds that no triable issues of fact exist regarding this alleged employment-related issue.

### 3. As to Whether the "Insured Versus Insured" Exclusion Applies to IDS or the Plan's Claims in the Event it Applies to Russ's Claims

■ As an initial matter, contrary to the Plaintiffs' assertion, the Court finds that

the phrase "at the direction of" included in the D & O policy's "insured versus insured" exclusion is not ambiguous. *See Fed. Ins. Co.*, 639 F.3d at 567; *Haber*, 137 F.3d at 695. Therefore, the Court will give the phrase its "plain and ordinary meaning" *Fed. Ins. Co.*, 639 F.3d at 567. Merriam–Webster defines "direction" as "guidance or supervision of action or conduct." (www.merriam-webster.com, last visited November 21, 2012.) Similarly, Black Law's Dictionary defines "direction" as "an act of guidance." Blacks 7th Ed. P. 472.

According to the Plaintiffs, even if the "insured versus insured" exclusion applies to Russ, it should not bar coverage for IDS and the Plan's claims, because they are separate legal entities. However, it is undisputed that IDS and the Plan are solely controlled by Russ. Indeed, Russ is the only member of IDS and is the only fiduciary of the Plan. As a consequence, IDS and the Plan can act only "at the direction" of Russ. Therefore, in the event it is later determined that Russ had been duly elected or appointed to the Board, the "insured versus insured" exclusion would apply not only to his claims but also to those of IDS and the Plan, which were brought at Russ's direction. *See PowerSports, Inc. v. Royal & Sunalliance Ins. Co.*, 307 F.Supp.2d 1355 (S.D.Fla.2004).

### 4. As to Whether the "Insured Versus Insured" Exclusion Applies in the Absence of Collusion

■ The Plaintiffs argument that the "insured versus insured" exclusion is inapplicable in cases that do not involve collusion is also unavailing, as the Plaintiffs' position overlooks the plain meaning of the language of the D & O policy. *See Andy Warhol Found. for the Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir.

1999) ("[A]n insurance policy, like any contract, must be construed to effectuate the intent of the parties as derived from the plain meanings of the policy's terms."). In this regard, nothing in the language of the "insured versus insured" exclusion suggests that there is a collusion requirement. Although the "original rationale behind the exclusion was to bar coverage for collusive suits, such as suits in which a corporation sues its officers or directors in an effort to recoup the consequences of their business mistakes[,] . . . the exclusion's rationale does not trump its text." *Sphinx Int'l, Inc.*, 412 F.3d at 1229 (citation and internal quotation marks and altercations omitted); *see also Greenman–Pedersen, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 10 Civ. 2777(BSJ), 2011 WL 3796336, at *4, *4 n. 5, 2011 U.S. Dist. LEXIS 90202, at *11, *13–14 n. 5 (S.D.N.Y. Aug. 9, 2011) (holding that under Florida law—which has the same approach to interpreting insurance policies as New York law—"a court must apply the plain language of the policy, regardless of the [fact that the] underlying purpose" of "insured versus insured" exclusions is to prevent collusive suits). Accordingly, the Court finds as a matter of law that a showing of collusion is not required in order for the Defendant to disclaim coverage for the Plaintiffs' claims under the "insured versus insured" exclusion.

**D. *As to Whether The Defendant Has Met its Burden of Establishing as a Matter of Law that the Plaintiffs are Estopped from Denying that Russ was a Director on VMS's Board***

The Defendant's second argument in support of its motion is that the Plaintiffs are estopped from denying that Russ was a director on VMS's Board because VMS and the Plaintiffs had previously represented that Russ was a director and the Defendant relied upon their representations to its detriment. In contrast, the Plaintiffs claim that the Defendant had a duty to investigate and determine if Russ was duly elected or appointed as a director, and therefore, the doctrine of equitable estoppel should not be applied in this case.

As an initial matter, the Court recognizes that as a result of the Insureds assignment of their rights under the D & O Policy to the Plaintiffs, the Plaintiffs now stand in the shoes of the Insureds and, thus, possess no more rights than the Insureds had possessed. Accordingly, the Defendant may raise the same defenses against the Plaintiffs as it would have against the Insureds. *See, e.g., Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,* 631 F.3d 42, 55 (2d Cir.2011).

"The doctrine of equitable estoppel precludes a party at law and in equity from denying or asserting the contrary of any material fact which he has induced another to believe and to act on a particular manner." *Sterling v. Interlake Indus.,* 154 F.R.D. 579, 585 (E.D.N.Y. 1994) (citation and internal quotation marks omitted). In this way, "[e]quitable estoppel prevents one from denying his own expressed or implied admission which has in good faith been accepted and acted upon by another." *Dunlop–McCullen v. Pascarella,* 97 Civ. 0195(PKL)(DFE), 2002 WL 31521012, at *14, 2002 U.S. Dist. LEXIS 21854, at *51 (S.D.N.Y. Nov. 13, 2002). "Under New York law, equitable estoppel requires a showing of (1) [a]n act constituting a concealment of facts or a false misrepresentation; (2) [a]n intention or expectation that such acts will be relied upon; (3) [a]ctual or constructive knowledge of the true facts by the wrongdoers; (4) [r]eliance upon the misrepresentations which causes the innocent party to change

its position to its substantial detriment." *General Elec. Capital Corp. v. Eva Armadora, S.A.,* 37 F.3d 41, 45 (2d Cir.1994); *see also Sterling,* 154 F.R.D. at 585; *see also Nasso v. Bio Reference Labs., Inc.,* 892 F.Supp.2d 439, 448–49, No 11–CV–3480 (JFB)(ETB), 2012 WL 4336429, at *6, 2012 U.S. Dist. LEXIS 136554, at *20 (E.D.N.Y. Sept. 24, 2012). "There does not have to be an actual attempt to mislead"; instead, "[i]t is sufficient that the party being estopped knew or had reason to believe that their acts or inaction might prejudice the party asserting the estoppel." *Sterling,* 154 F.R.D. at 585. "Moreover, to support an equitable estoppel argument, a party must show that its detrimental reliance was reasonable under the circumstances." *Levine v. Greece Cent. Sch. Dist.,* 353 Fed.Appx. 461, 464 (2d Cir.2009) (citing *Paese v. Hartford Life Accident Ins. Co.,* 449 F.3d 435, 447 (2d Cir.2006).).

 "Estoppel is usually a question of fact inappropriate for summary judgment." *Dunlop–McCullen v. Pascarella,* 2002 WL 31521012 at *15, 2002 U.S. Dist. LEXIS at *51; *see also Bennett v. United States Lines,* 64 F.3d 62, 65 (2d Cir.1995) ("Whether equitable estoppel applies presents an issue of fact."). In this case, the Court finds that triable issues of fact exist with respect to one of the abovementioned elements of the doctrine of equitable estoppel. Therefore, summary judgment is inappropriate.

With respect to the first element, it is undisputed that VMS represented to the Defendant in its Renewal Application, public filings and correspondence with the Defendant that Russ was a director on VMS's Board and, thus, an insured. Also, Russ has previously represented himself as a director on VMS's Board, including in the Underlying Action. Therefore, assuming that Russ was not an insured because he was not duly elected or appointed to the VMS Board, no triable issue of fact would exist as to whether there were acts constituting false misrepresentations.

As for the second element, VMS specifically acknowledged that its representations in the Renewal Application and in the supplemental materials were "the basis of the contract should a policy be issued and have been relied upon by the insurer in issuing any policy." (Compl., Exh. A.) In addition, the Plaintiffs concede in the Complaint that the Renewal Application was accurate at the time it was submitted. (Compl., ¶ 51.) Therefore, there is also no triable issue of fact as to whether there was an expectation that the acts of misrepresentation would be relied upon.

There is similarly no triable issue of fact as to whether VMS had "actual or constructive knowledge of the true facts." Clearly, VMS should have been aware of its own corporate procedures and documents. Thus, VMS was in a position to know whether Russ had been duly appointed or elected to the Board and, as a result, whether or not he was an insured under the D & O policy.

 However, the Court finds triable issues of fact do exist with respect to the fourth element of the equitable estoppel doctrine. In reaching this conclusion, the Court recognizes that the evidence shows that the Defendant did rely on VMS's and Russ's representations in disclaiming coverage for the Plaintiffs' claims under the "insured versus insured" exclusion of the D & O policy. The Court further recognizes that the evidence shows that as a result, the Defendant, to its detriment, decided to forego any contractual rights it had under the terms of the D & O Policy to "effectively associate" with its insureds in the "investigation, defense and settlement" of any claim that "appears reasonably likely to be covered in whole or in part" by the D & O Policy. (Compl. Exh.

A.) Nevertheless, a triable issue of fact still exists as to whether the Defendant was justified or reasonable in relying on VMS's and Russ's representations that Russ was a director on the Board. *See Levine,* 353 Fed.Appx. at 464.

Specifically, a question remains as to whether the Defendant, as a sophisticated insurer, failed to properly investigate VMS's representations that Russ was a Director, particularly in that it failed to seek additional corporate documents from VMS verifying that Russ was duly appointed or elected. *See, e.g., Idearc Media LLC v. Siegel, Kelleher & Kahn LLP,* 09–CV–1090S, 2012 WL 162563, at *5, 2012 U.S. Dist. LEXIS 5687, at *15 (W.D.N.Y. Jan. 16, 2012) (holding in a fraudulent inducement case that "[w]hether or not a party's reliance on a representation was justifiable is typically a question of fact, one that requires consideration of 'the level of sophistication of the parties, the relationship between them, and the information available' at the time of the operative decision' ") (citing *JP Morgan Chase Bank v. Winnick,* 350 F.Supp.2d 393, 406 (S.D.N.Y.2004)); *Ogunsanya v. Langmuir,* 08–CV–940 (JG), 2008 WL 4426590, at *4, 2008 U.S. Dist. LEXIS 74376, at *13 (E.D.N.Y. Sept. 26, 2008) (same); *JP Morgan Chase Bank,* 350 F.Supp.2d at 406 (holding in a fraudulent misrepresentation case that "sophisticated business entities are held to a higher standard"). As such, the Court declines to grant the Defendant's motion to dismiss, converted to one seeking summary judgment, on the ground of equitable estoppel.

## III. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED** that the motion to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is converted to a motion for summary judgment under Federal Rule of Civil Procedure 56; and it is further

**ORDERED** that, based on the foregoing findings of triable issues of fact, the Defendant's motion to dismiss, converted to one seeking summary judgment, is denied.

**SO ORDERED.**